In the Matter of ALLIED SUPERMARKETS, INC., a Delaware corporation, Debtor.

Albert SEMAAN, Al Semaan, Inc., a Michigan corporation, d/b/a Food Center Supermarkets, Inc., a dissolved Michigan corporation, Food Shoppers, Inc., a dissolved Michigan corporation, Food Center Supermarket-Six Mile Limited, a dissolved Michigan corporation, Jointly and Severally, Plaintiffs,

v.

ALLIED SUPERMARKETS, INC., a Delaware corporation, Defendant.

BELAIR SUPERMARKET, INC., Semaan's Market, Inc., Belair Supermarket, Inc., # 2, Thomas Semaan, Individually and d/b/a Chrystal Palace, Tony Semaan, and Ruth Semaan, his wife, and Peter Semaan, Jointly and Severally, Plaintiffs,

v.

ALLIED SUPERMARKETS, INC., a Delaware corporation, Defendant.

Bankruptcy No. 78–92871–W.

United States Bankruptcy Court, E. D. Michigan, S. D.

July 27, 1982.

Sheldon S. Toll, Detroit, Mich., for Allied.

Lawrence J. Stockler, Detroit, Mich., for Semaan.

## MEMORANDUM OPINION AND ORDER

### GEORGE E. WOODS, Bankruptcy Judge.

This matter, a bifurcated trial on the issues of liability and damages, originally came before the Court for trial on liability; and, at its conclusion, Judge Harry Hackett rendered an opinion and order from the bench wherein he ruled against the defendant. The issue of damages was never heard by this Court's predecessor.

In April, 1981, the defendant brought a motion for rehearing which was subsequently denied by Judge Hackett. Thereafter, the defendant brought a motion for a new trial which this Court, without objection of the parties, treated as a motion to reconsider the order denying the motion for rehearing of the order and finding of liability by Judge Hackett. Though offered the opportunity to present additional evidence bearing upon liability, each party relied on the proofs earlier submitted. This Court thereupon invited and received proposed findings of fact and conclusions of law from each counsel.

In the pertinent period, the Abner A. Wolf Company (Wolf), a division of Allied Supermarkets, was a wholesaler engaged in the business of selling groceries and merchandise to retail grocery stores and supermarkets. In 1966, Wolf began selling goods to one or more of the plaintiffs who operated retail grocery stores throughout the Detroit metropolitan area. The plaintiffs ceased doing business with the defendant in October or November of 1978.

In connection with the sale of groceries and merchandise to retailers, Wolf assisted the retailers by providing suggested retail prices. The retailers were in no way obligated to adopt those suggested prices. The suggested prices, as computed by Wolf, were designed to take into account the degree of competition which a retailer might face at his particular store. Depending on the degree of competition, a retailer's store was assigned a zone. In the Wolf system, those zones were labeled 60, 61 and 62. A location rating of Zone 62 indicated the presence of direct competition. Wolf's suggested retail prices for this zone were low, thereby enabling the retailer to sell goods in line with the competition. Suggested retail prices at stores with a Zone 61 rating were somewhat higher and the highest prices were found in Zone 60.

Wolf did not require the retailer to adopt its zoning recommendation, although it was believed that should the retailer do so, his sales volume would be greater than if he adopted a different rating. The plaintiffs were given a zone rating of 62 but instead chose Zone 61. The plaintiffs were able, therefore, to charge higher prices for their goods.

Additionally, the Wolf system included Wolf's computation of gross profit which was determined by subtracting the wholesale price of the goods from the suggested retail price. The gross profit percentage was determined by dividing the gross profit figure by the suggested retail price. In the calculation of gross profit, Wolf did not include its charges and fees for freight, labeling, services and miscellaneous fees and charges. The plaintiffs allege that the defendants misled them, through misrepresentation and concealment, into believing such fees and charges were included in the

Wolf gross profit calculation, when they were not, obviously distorting the true margin of profit picture.

Wolf's computation of gross profit was provided to its retailers on a weekly basis— and, apparently, the procedures then employed are the same today. Wolf Form No. 36 (Exhibit 3) is a weekly billing form which itemizes the cost of goods by category, charges for freight and service fees, the total amount due from the customer and the gross profit as expressed in dollars or as a percentage. Wolf Form No. 108 (Exhibit 1) is an itemized list which accompanies delivery to every retailer and sets forth gross profit figures only.

The record herein indicates that the gross profit is calculated on a cost plus basis, that is, the cost to Wolf plus an added percentage, as mark-up, would equal the price at which Wolf sold the goods to retailers. The mark-up is comprised of charges and fees for services and the like. This cost, however, was not the actual cost to Wolf because two costs are involved. One is the cost at which Wolf sells to the retailer telling him it is Wolf's cost. The other is the actual cost to Wolf. The former is not Wolf's actual cost because it receives allowances and discounts for swollen and spoiled goods as well as labeling and advertising discounts. These benefits are not passed on to the retailers.

To illustrate this system, assume a case of peas has a cost to the defendant of $10.00, and there is a mark-up of 5% (representing service charges and fees). This would make the actual cost to the retailers $10.50. Assume further that the suggested retail prices on the peas represented a 20% mark-up. This 20% would be figured on the initial $10.00 per case cost to the defendant but does not include the 5% service fee mark-up. On a 20% mark-up, therefore, the plaintiffs' real net gross profit margin is 15% instead of 20%.

The plaintiffs claim that the defendant misled or misrepresented to them that the service fee and charges mark-up by Wolf was included in the defendant's calculation of gross profit. Alternatively, the plaintiffs claim the defendant concealed that fact from them. Further it is alleged that the defendant intended that the plaintiffs rely on these representations. The plaintiffs claim as damages lost profits, damaged credit rating, and losses as a result of interest payments.

The record, lengthy and ofttimes disjointed, indicates to this Court that Wolf did not make any statements or representations to the plaintiffs which could be considered false or misleading. It is evident that at the beginning of the plaintiffs' relationship with the defendant, Wolf had informed plaintiffs of the substance of the forms which it supplied to the plaintiffs. The plaintiffs, not nearly as unsophisticated as they would have us believe, understood the nature and purpose of the forms, in the Court's opinion.

Prior to 1978, there was never any clear representation by the defendant that the mark-up for service charges and fees was included in the calculation of gross profit. The Court finds, however, there was no compelling duty imposed on the defendant to disclose such because, in this Court's opinion, it was reasonable for the defendant to assume that either the plaintiffs or their accountants could or would perform the simple calculations necessary to reveal the obvious fact, especially since plaintiffs were highly experienced in a highly competitive business and had a succession of ventures in the field. Testimony never indicated plaintiffs did not understand the program, forms and procedures. Further, when the plaintiffs finally did inquire of the defendant as to the inclusion or exclusion in the gross profit computation of the service fee mark-up, the defendant was forthright in its answer indicating such was excluded. However much it might be suggested that such a late-date communication between the parties was incredible, particularly between trade-wise parties on both sides, the existent condition prior thereto cannot be elevated into actionable fraud, misrepresentation, concealment or otherwise. To suggest to the contrary is to conclude defendant was engaged in a pattern of investing and

loaning large sums of money and inventory to retailers whom they knew would become insolvent still owing, of course, even larger sums of money and/or inventory to defendant. That, obviously, is absurd.

The plaintiffs were well aware of the various charges and fees assessed against them by the defendant. Such were all over the forms provided to plaintiffs, to say nothing of the fact the charges themselves were common to the business and its practices, within the "A, B, C's" of the trade. This Court finds that the plaintiffs, with or without the aid of their accountants, could have determined easily that these charges, comprising the percentage mark-up, were not included in the defendant's calculation of gross profit.

The argument by the plaintiffs that the defendant represented that if the plaintiffs sold their goods at suggested retail prices the plaintiffs would make a certain gross profit ignores the fact, as mentioned above, that the plaintiffs knew all the charges incurred against them. Also, as to the computation of gross profit, depending on what the defendant included or excluded as items bearing on the cost of goods, the defendant's percentage could well have been correct.

In any event, the gross profit will always be determined by the following: the amount the plaintiffs paid the defendant (something over which the plaintiffs had little, if any, control); the prices at which the plaintiffs sold their goods (something over which plaintiffs had absolute control); and the unique and individual cost factors of maintenance and overhead (about which the defendant could know little, if anything, as to how such might bear upon the difference between success and failure in such a tight margin-of-profit situation).

The claim of reliance by the plaintiffs is without merit. If the plaintiffs did not read the information provided to them as to what constituted gross profit, and there has been no testimony which shows that they even knew what gross profit was, with or without the charges, then they obviously cannot claim reliance on any of the defend-

ant's representations or any trade practices or definitions. Gross profit was as the defendant represented; there was no deceit as to what the plaintiffs had to pay.

The claim by the plaintiffs that the defendant was required to compile the forms given to the plaintiffs in accordance with generally accepted accounting principles is also without merit. First, testimony indicated the forms are not financial statements or balance sheets. Generally accepted accounting principles are used in the formulation of those types of documents, not the billings, information tabulations and account records which concern the Court herein. Secondly, the testimony does not indicate the existence of any requirement to use a generally accepted accounting principle with regard to the preparation of these documents—or, that there is such a hard-and-fast standard. Finally, the computation of gross profit is not limited to any one method; there are several, and many of these are considered reasonable and in accordance with the generally accepted accounting principles. The method utilized herein is reasonable and not misleading. The Court finds it is not calculated, intentionally or otherwise, to misrepresent or conceal data to the detriment of a retailer. The record indicates that such a method is not at all uncommon in the supermarket and grocery industry.

The method utilized in the computation of gross profit by the defendant on behalf of the plaintiffs is intended only to give certain information which the plaintiffs may relate to their individual costs. A consistent practice is utilization of the generally accepted accounting principles but a practice may vary from one supplier to another. The Court finds that Form No. 36 (Exhibit 3) and Form No. 108 (Exhibit 1) are reasonable presentations and are not misleading. The forms, in this Court's opinion, meet the minimal requirements for disclosure without convolution or omission of facts which might render them misleading.

After in-depth review of the testimony and the evidence relating to the plaintiffs' financial statements, tax returns and other

relevant documents herein, the Court finds that any failure of the defendant to include other charges in the gross profit computations did not have any significant impact on the plaintiffs' profits or losses. Sufficient other information was provided to negate such as a contributing factor. Even if the defendant had supplied the information in whatever form plaintiffs would now suggest, as opposed to the form and manner in which it was provided, the record clearly indicates that the plaintiffs lost dollars at a higher rate or percentage on other suppliers' goods than on the defendant's. This leads the Court to conclude that even if the defendants had done what the plaintiffs claim should have been done, the plaintiffs would still have lost money. Even if it is open to debate that a person of relatively low mathematical ability could understand gross profit as shown on the forms, these plaintiffs, as earlier noted, are not illiterate or ignorant immigrants which some would have the Court believe. Albert Simaan (correct spelling: Semaan) has been in the retailing business since 1946 and bought his first store in 1956. Since that time he has owned a number of other stores. The other plaintiffs also have experience in the retail grocery and supermarket industry in that one or more of them have owned numerous stores. It cannot be said, therefore, that the plaintiffs were "taken" by the defendant. The plaintiffs have much more business sophistication than appears, even with deft use of idioms in assessing a business situation. One or more knew, in literal and recited detail of freight, service, label, administrative, electronic ordering machine, supervision, advertising and other charges from the outset—but chose, as a matter of individual judgment, not to bother to read the given record (as an exhibit herein) furnished daily or weekly by defendant. Again: one or more plaintiffs knew what did or did not carry certain service fees. At least one of the plaintiffs, Albert Semaan, appears to have made his business judgments privately; for, this plaintiff felt he did not need an accountant or an attorney on the issue of profit or loss. It was his claim no one ever told him his business was losing money: he alone determined that fact.

An individual operating a business in this complex field of endeavor must be able to understand one's financial problems, and a reasonably prudent businessman is one who exercises due care in doing so.—And we note in passing that plaintiffs, indeed, did employ auditors and accountants over their many years in this specialized and competitive business.

Accordingly, this Court finds no misrepresentation, fraud, concealment or deception relating to any material fact offered by the defendant. Nor does this Court find any reasonable reliance on the plaintiffs' part on any of the representations made by the defendant. This Court further adopts and incorporates by reference the defendant's proposed findings of fact and conclusions of law as a supplement to this Opinion.

Judgment is for the defendant.

So ordered.